EDWARD D. BARRY, Admr. of the Estate of JOSEPH J. BARRY, Deceased, Plaintiff-Appellant, *v.* ELGIN, JOLIET & EASTERN RAILWAY COMPANY *et al.,* Defendants-Appellees.

(No. 53324;

First District—March 1, 1971.

John A. Doyle and Hugh McCarthy, both of Chicago, for appellant.

Hackbert, Rooks, Pitts, Fullagar & Poust, of Chicago, (Paul Noland and James T. Harrington, of counsel,) for appellees.

Mr. JUSTICE GOLDBERG delivered the opinion of the court:

This appeal brings before the court a most tragic industrial accident which resulted in the death of Joseph J. Barry on September 3, 1964. At that time, he was 19 years of age and was employed by the United States Steel Company in its foundry in Chicago. Plaintiff is administrator of the estate of the deceased and claims damages for alleged wrongful death and recovery of funeral expenses. Deceased left surviving his father, mother, one brother and one sister.

The defendants are the Elgin, Joliet and Eastern Railway Company, a corporation, (referred to as the "Railway") and Dean Wallace, an employee of the Railway. Plaintiff claims negligence on the part of defendants in operation of a train of cars upon a switchtrack running inside the foundry.

Plaintiff's complaint charges that defendants failed to exercise ordinary care to maintain a lookout prior to moving the railroad cars; moved the cars when danger to deceased was imminent; failed to give adequate warning of the movement of the cars considering the noise and activity within the foundry; moved the cars when danger to deceased was imminent, of which danger they knew or should have known; failed to stop the cars prior to striking deceased; and failed to use an adequate system of control for moving the cars. The answer of defendants denies that deceased was in the exercise of ordinary care for his own safety considering his age, intelligence, capacity and experience, and alleges that the deceased was inattentive and negligent and that this proximately caused his death. The answer admits that defendants were operating the train in question but denies that the operation was under their control or direction. The answer also denies the specified charges of negligence.

There was trial by the court without a jury. The judgment order found the issues in favor of defendants and directed entry of an appropriate judgment. The order also contained a "finding of fact" that plaintiff failed to sustain the burden that decedent was in the exercise of ordinary care for his own safety and a "conclusion of law" that defendants were under no duty to warn persons inside the foundry of impending danger and that they did not undertake to do so.

The question of propriety of these two portions of the order, that is the finding of fact and the conclusion of law, constitutes the two basic issues in this appeal. There are also several collateral questions presented, as hereinafter noted. Determination of the two basic issues first requires description of the complicated area and of the technical process in the foundry. Truly a series of pictures would save many words at this point. The foundry building is operated by United States Steel Corporation. The building is approximately 200 feet in depth. It was erected some 40 or more years ago and is apparently used for casting heavy iron objects. The length of the entire structure runs from north to south. However, the single track in question enters the foundry building on its east side and goes entirely through to the west or back end of the building.

This track approaches the foundry in a large curved arc. It does not become straight until shortly after it enters the front or east end of the building. As it progresses in a westerly direction, the track passes a

number of so-called bays or divisions of the foundry. These bays are divided by walls with doors large enough to permit passage of a train.

At the east entrance to the building, there is a gate which may be closed to bar the tracks or opened by steel company personnel inside the foundry. Commencing at this eastern entrance, there is first the Stool Foundry Bay, 65 feet in length. Next is an Oven Bay of 30 feet; then an Ingot Mold Bay 65 feet long; and, finally, at the rear end, a Storage Bay 33 feet in length. In the first bay, there is a large mechanism called a ladle tipper, used in the process of pouring out the contents of the ladles. Similarly, there is a ladle tipper in the Ingot Bay. The foundry also contains seven huge overhead cranes. Each of these machines is equipped with a warning bell which sounds when the crane is in operation. These bells are mechanically operated by a foot pedal. The volume of sound emitted by them will build up to a climax and then drop off.

In operation of the foundry, an engine would approach the front gate of the building. The engine would be pushing a number of so-called ladle cars containing hot metal. These cars, which are sometimes referred to as "ladles", are about 25 feet long, 10 feet wide and 10 feet high. Immediately at the entrance door, there is a large sign in block letters advising that locomotive and crew of the Railroad may not go beyond that point. The ladle cars are pushed by the engine which thus would be behind them as they enter the plant. To admit the cars, the operator of a tipper would open the gate and turn on the bells. These are three separate warning bells in the foundry which operate continuously when the gate is open and the switching process is being performed by Railway equipment in the foundry. One bell is at the outside of the first bay near the entrance; another on the farther or west wall of the first bay and the third deep inside the foundry on the west wall of the third bay referred to as the Ingot Mold Bay. There is also a red warning light inside the foundry at the east gate to warn of the operation of the train. The light goes on at the same time as the three warning bells.

In the process of supplying hot metal to the foundry, the front gate was opened so that the Railway engine could then back the cars into the building on the switch-track. The tipper operator could spot the cars or put them into proper position so that the ladle could be tipped and the hot metal emptied out. When the ladle cars had been emptied, they could be moved back to the foundry entrance by means of a car puller winch with cables which was operated by the tipper man. About ten to fifteen minutes would elapse from removal of the empty cars until the loaded cars would enter the foundry.

The deceased was employed by the foundry as a so-called "gas man".

He would pull the cable from the winch and append it to one of the empty ladle cars so that the tipper operator could then move the empty car, by means of the winch, to the entrance for removal by the Railway engine and crew. The deceased had been employed as a laborer on August 5, 1964. Five and one-half days before his death, he was promoted to this new assignment. At the time of the occurrence, he was in excellent health and had good eyesight and hearing and no physical defects. He had completed his high school education in June of 1964.

On September 3, 1964, at about 11:00 A.M., deceased had pulled the cable into position to be used to remove empties. Four empty ladle cars were removed from the foundry by the engine operated by the Railway crew. The engine backed away with these empty cars and then three loaded ladle cars were appended to the last of the empty cars. The engine then proceeded upon the curved track toward the plant pushing the series of four empty ladle cars together with the three full ladle cars in front of them. The Railway train crew consisted of the defendant, Wallace, who might be termed a conductor or a switchman, his helper and the engineer. The train stopped with the first loaded car near the foundry entrance.

One of the tipper operators, Francisco Cardenas, walked to the gate and opened it. He looked west down the track, into the foundry, and saw nobody. He activated the three warning bells and also the red light at the gate. Cardenas then told deceased to pull the cable and saw him pull it from east to west. He did not see deceased thereafter. He then started to return to his crane; and, when 40 to 60 feet west of the gate, he gave the defendant, Wallace, the signal to go on. Wallace was outside the foundry walking in front of the loaded ladle cars. As he approached the foundry entrance, he could see through the entire building and had a clear view of the whole track. Wallace testified that he looked in all directions and made sure that his assistant was in proper position to see him. When the first two cars had entered the door, Wallace had no view of the engineer and could not see him. Also, his view of that portion of the track within the foundry was obstructed. But he had a view of his assistant to whom he always gave signals which were then transmitted to the engineer to regulate the motion of the engine.

Wallace testified that he looked before the train started and that he saw no one between the rails through the entire plant. He did not see deceased in the plant at any time before the occurrence. The train proceeded at a slow pace. One witness said the train was "creeping". Wallace permitted the train to continue backing into the building until six of the ladle cars were within the entrance and one was outside. He then

gave the signal to stop the train at its customary place. In this operation, the engineer could not see the gate as soon as the first ladle car had reached it. When the train had stopped, some person shouted to Wallace that the train had run someone over. Wallace walked into the foundry and saw the body of the deceased between the first two ladle cars; that is, the ones farthest from the engine, which had first entered the plant. Deceased had been killed instantly.

There were two eyewitnesses to the occurrence; both of whom testified for plaintiff. Peter Gronkiewicz was a crane operator at the foundry. At the time, he was in the cab of his crane which was about 65 feet west of the foundry entrance. This witness reached back for a drink of water from a jug in his crane cab. When he turned around, he saw the ladle cars coming in on the track. At that time, the deceased was walking in a westerly direction on the track in front of the cars. A few seconds elapsed, the witness said, between the time that he first saw the boy and the instant that the first oncoming ladle car struck him in the back and pitched him forward.

This testimony leads to a discussion of one of the disputed points. The witness made a written statement in January of 1968 in which he said that deceased was struck some 20 or 25 feet west of the east entrance of the foundry. This would pinpoint the occurrence within the first foundry bay immediately west of the entrance which is referred to as the Stool Foundry Bay.

Robert Dudak, a Chicago police detective who investigated the occurrence, arrived at the plant about noon. He testified that he saw bloodstains near the track in two separate locations 25 and 50 feet west of the entrance door. However, the crane operator, Peter Gronkiewicz, testified that he had been confused in his pre-trial statement by a picture of the scene which was "hazy", as he advised counsel for plaintiff by telephone; that he had spoken to the plant superintendent and that the actual place of the occurrence was approximately 65 feet to the west of the east entrance. This would place the occurrence either at the western edge of the Stool Foundry Bay or further west and within the Oven Bay.

Gronkiewicz was stationed overhead in his crane cab within the next bay to the west referred to as the Ingot Mold Bay. The foundry superintendent, John Durant, did not witness the occurrence and did not arrive at the scene until about noon. He saw the body on the south rail of the track about 15 feet west of the Ingot Mold Tipper. This would locate the occurrence as being within the third bay known as the Ingot Mold Bay and more than 100 feet west of the east entrance to the foundry. However, in our opinion, the precise point of impact is not a material point.

The other eyewitness, Robert Miller, was an employee at the foundry. Unfortunately, there is a suggestion in the record that he had been drinking shortly before his testimony. He knew the deceased and had met him shortly before the occurrence when they were waiting in line for a drink of water. The water cooler was about 65 feet from the east entrance. Gronkiewicz, the crane operator, testified that deceased was about 30 feet west of the water cooler when struck by the train.

Robert Miller further testified that just before deceased was struck by the train, he was walking almost in the middle of the tracks in the same direction as the oncoming train. Miller testified that he was walking in the same direction after he had obtained his drink from the water cooler. Miller stated that at this point he could see all the way down the track and that he saw Peter Gronkiewicz in his overhead crane.

This recital of the evidence brings us to another subsidiary question regarding the type of warnings provided within the foundry for persons in the vicinity of the track. As above stated, the gate at the east entrance remained closed until opened by foundry personnel. On this particular date, there were three electrically operated warning bells and a warning light in the foundry. It is agreed that there was a high degree of noise level in the foundry. Each of the seven mechanically operated cranes had its own warning bell. These cranes operated "continuously". There is evidence that these two types of bells delivered different rings which were described by some witnesses as being distinctive and by others as being distinguishable. However, plaintiff's witness Robert Miller testified that there was "a whole lot of noise" in the foundry and that all of the bells sounded "the same".

There is a dispute as to whether deceased fell immediately before he was struck by the train. Plaintiff's complaint contains no such allegation. The plaintiff's witness, Robert Miller, did not so testify on direct examination. However, at the coroner's inquest, Miller testified that before the train struck deceased he hollered, "Look out" and it "looked like" deceased "looked around and the next thing I knew he was falling". The other eyewitness, Peter Gronkiewicz, a foundry crane operator, did not testify that deceased fell. He stated that the train hit deceased, "in the back". For purposes of this appeal, it is not necessary to attempt to reconcile the testimony on this point.

■■ The first basic legal problem presented is the issue of the duty of the Railway. The trial court found as a conclusion of law that the defendants were under no duty to warn persons inside the foundry of impending danger. We must respectfully disagree. It is true that employees of the Railway were obliged to and did remain outside of the foundry. It cannot be denied, however, that from their position on the

outside they caused entrance of the Railway cars to the foundry and controlled the motive power which moved the cars when deceased came to his death. In our opinion, in the case at bar, as a matter of law the defendant Railway owed a duty of ordinary care to prevent injury to persons working in the vicinity of its switch-track who might foreseeably be injured by movement of the cars propelled by the Railway engine even though that switch-track was actually operated within premises owned by another corporation. *Schutt v. Terminal Railroad Assn. of St. Louis,* 79 Ill.App.2d 69, 81; *Wilson v. Terminal Railroad Assn. of St. Louis,* 333 Ill.App. 256, 264 and *Milauskis v. Terminal Railroad Assn. of St. Louis,* 286 Ill. 547, 556. See also, 44 Am. Jur. Railroads, §441, 666.

The next question ordinarily would be consideration of the facts to decide whether defendant Railway breached its duty as above set forth and as alleged in plaintiff's complaint. However, disposition of this appeal depends primarily upon a determination of the second basic issue presented by this record; whether the court erred in finding plaintiff guilty of contributory negligence. Under the view we take of this second fundamental question, it is unnecessary to consider the facts regarding performance of the legal duty of the railroad and it is also unnecessary to consider the contention of plaintiff that evidence of "local custom" received by the court was improper.

■■ Undoubtedly, it was the duty of plaintiff to allege and prove that deceased was in the exercise of ordinary care for his own safety so that he was free from contributory negligence. *Keen v. Davis,* 38 Ill.2d 280, 284; *McIntyre v. Belt Ry. Co.,* 105 Ill.App.2d 45, 52; *Compton v. Frank,* 126 Ill.App.2d 356, 359.

■■ The testimony of the eyewitnesses called by plaintiff is clear and direct that deceased was walking down the center of the track in the same direction as the train with his back toward the oncoming cars. However, plaintiff attempted to prove freedom of the deceased, from contributory negligence by the testimony of the parents and sister of the deceased that he was a young man of careful habits. Counsel for plaintiff relied upon the decision in *Plank v. Holman,* 108 Ill.App.2d 216. But, after the filing of the briefs in the case at bar, and shortly before oral argument, the Supreme Court reversed the decision in *Plank v. Holman,* 46 Ill.2d 459. The Supreme Court held that it was not necessary for an eyewitness to see everything that occurred at the accident scene in order to render proof of careful habits incompetent. The principle is established by this decision of our Supreme Court that "the use of the secondary evidence of careful habits was allowable only if direct evidence of the fact was shown to be unavailable". (46 Ill.2d at page 459.)

It follows that the trial court was correct in rejecting evidence of careful habits of the deceased as proof of freedom from contributory negligence. ▮▮▮ Whether or not deceased in this case was guilty of contributory negligence, including the twin concepts of due care and proximate cause, was a question of fact for determination by the trial court. (*Smith v. Bishop*, 32 Ill.2d 380, 383; *Baran v. Chicago Heights*, 43 Ill.2d 177, 181.) The trial judge, who saw and heard all of the witnesses, concluded and specifically found that plaintiff had failed to prove that deceased was in the exercise of ordinary care for his own safety. Not only is it beyond our power to substitute our opinion for that reached by the trial judge but here we find that there is ample competent evidence in the record to support the finding of the trial court that plaintiff failed to prove that deceased was in the exercise of due care. We cannot say that the finding of the trial court is against the manifest weight of the evidence. Therefore, the finding that decedent failed to exercise due care must be affirmed. *Chapman v. Huttenlocher*, 125 Ill.App.2d 39, 47; *Dvorson v. City of Chicago*, 119 Ill.App.2d 357, 363; *In re Estate of Dal Paos*, 118 Ill.App.2d 235, 242; *Hayes v. Hayes*, 117 Ill.App.2d 211, 215; etc.

We have given full consideration to those cases decided by our courts which bring out the fact that an employee is often obliged to put himself in a place of peril by virtue of his duties. Duty to an employer might well require a workman to remain in a place of danger. This factor must be considered in weighing the evidence of the degree of care exercised by a plaintiff. (*Pioneer Fireproof Co. v. Hansen*, 69 Ill.App. 659, 664, affirmed 176 Ill. 100; *Storment v. Swift & Co.*, 5 Ill.App.2d 417, 423; *Hargis v. Standard Oil Co.*, 10 Ill.App.2d 119, 123.) Certainly, in the case at bar, this youthful decedent was exposed to the regular perils of the foundry in connection with the discharge of his duties. However, we cannot overlook the undisputed fact that the deceased was, immediately before this occurrence, walking in the center of the tracks with his back to the oncoming train. Deceased was fully aware of the perils surrounding him. A short time before he had moved the cable for the purpose of removal of the empty ladle cars. He was well aware that the next step in the process was removal of the empty cars and entry into the plant of the loaded cars propelled by the engine. Therefore, he knew that grave danger from the train was imminent. The performance of his duties did not require him to walk down the middle of the track with his back to the oncoming cars. See *Howell v. Briney*, 125 Ill.App.2d 246.

We are fully aware of the tragic consequences of the untimely death of a young person. It may be that adoption of the rule of comparative

negligence might help to solve this and many similar problems. But, we are obliged to follow established principles as quite recently reiterated by our Supreme Court. *Maki v. Frelk*, 40 Ill.2d 193, reversing the decision in 85 Ill.App.2d 439, with dissenting opinion by Mr. Justice Ward. It follows that the judgment order appealed from must be affirmed.

Judgment affirmed.

BURKE, P. J., and LYONS, J., concur.